IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

THOMAS A. HIGHTOWER,

        Plaintiff,                No. CIV S-04-0887 GEB GGH P

     vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.         FINDINGS & RECOMMENDATIONS

_____/

I. Introduction

        Plaintiff is a state prisoner proceeding pro se with a civil rights action pursuant to 42 U.S.C. § 1983.  Pending before the court is defendants' July 12, 2006, motion for summary judgment and to dismiss for failure to exhaust administrative remedies.  The motion for summary judgment is made on behalf of defendants Sainz, Smith, Douglas, Nelson, Williams, and Bulanon.  The motion to dismiss is made on behalf of defendants Burton, Allen and Todd.  After carefully reviewing the record, the court recommends that defendants' motions be granted.

        The court also ordered service of defendant Peneta.  Service as to this defendant was not returned and the U.S. Marshal has no records regarding service.  Accordingly, the court will separately re-order service of defendant Peneta.

/////

1

II.  Summary Judgment

A.  Standards Under Rule 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court
> of the basis for its motion, and identifying those portions of "the
> pleadings, depositions, answers to interrogatories, and admissions
> on file, together with the affidavits, if any," which it believes
> demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2553 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  See id. at 322, 106 S. Ct. at 2552. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323, 106 S. Ct. at 2553.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of

specific facts in the form of affidavits, and/or admissible discovery material, in support of its

contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11,

106 S. Ct. at 1356 n. 11.  The opposing party must demonstrate that the fact in contention is

material, i.e., a fact that might affect the outcome of the suit under the governing law, see

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986); T.W. Elec.

Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the

dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the

nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

        In the endeavor to establish the existence of a factual dispute, the opposing party

need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the

claimed factual dispute be shown to require a jury or judge to resolve the parties' differing

versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary

judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a

genuine need for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P.

56(e) advisory committee's note on 1963 amendments).

        In resolving the summary judgment motion, the court examines the pleadings,

depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587, 106 S. Ct.

at 1356.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's

obligation to produce a factual predicate from which the inference may be drawn.  See Richards

v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902

(9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than

simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record

taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

1  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (citation omitted).

2          On February 18, 2005, the court advised plaintiff of the requirements for opposing

3  a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

4  F.3d 952, 957 (9th Cir. 1998) (en banc); Klingele v. Eikenberry, 849 F.2d 409, 411-12 (9th Cir.

5  1988).

6          B.  Analysis

7          This action is proceeding on the amended complaint filed September 2, 2004.  On

8  January 21, 2005, the court issued an order finding that the amended complaint stated the

9  following colorable claims for inadequate medical care in violation of the Eighth Amendment: 1)

10  defendant Sainz; ¶ 30; 2) defendants Douglas and Smith, ¶ 31; 3) defendant Douglas,¶ 33; 4)

11  defendants Sainz and Nelson, ¶ 34; 5) defendants Bulanon and Douglas, ¶ ¶36; 6) defendant

12  Todd, ¶ 43.  The court found that the amended complaint stated the following colorable

13  retaliation claims: 1) defendant Douglas, ¶ 37; 2) defendant Williams, ¶ 38; 3) defendants Burton

14  and Allen, ¶ 39.[1]

15          1.  Eighth Amendment Claims

16          *Legal Standard*

17          In order to state a § 1983 claim for violation of the Eighth Amendment based on

18  inadequate medical care, plaintiff must allege "acts or omissions sufficiently harmful to evidence

19  deliberate indifference to serious medical needs."  Estelle v. Gamble, 429 U.S. 97, 106, 97 S. Ct.

20  285, 292 (1976).  To prevail, plaintiff must show both that his medical needs were objectively

21  serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter,

22  501 U.S. 294, 299, 111 S. Ct. 2321, 2324 (1991); McKinney v. Anderson, 959 F.2d 853 (9th Cir.

23  1992) (on remand).  The requisite state of mind for a medical claim is "deliberate indifference."

24

25          [1]  On January 21, 2005, the court recommended that the remaining claims contained in
    the amended complaint be dismissed.  On March 30, 2005, the district court adopted these
26  findings and recommendations.

1   Hudson v. McMillian, 503 U.S. 1, 4, 112 S. Ct. 995, 998 (1992).

2          A serious medical need exists if the failure to treat a prisoner's condition could

3   result in further significant injury or the unnecessary and wanton infliction of pain.  Indications

4   that a prisoner has a serious need for medical treatment are the following:  the existence of an

5   injury that a reasonable doctor or patient would find important and worthy of comment or

6   treatment; the presence of a medical condition that significantly affects an individual's daily

7   activities; or the existence of chronic and substantial pain.  See, e.g., Wood v. Housewright, 900

8   F. 2d 1332, 1337-41 (9th Cir. 1990) (citing cases); Hunt v. Dental Dept., 865 F.2d 198, 200-01

9   (9th Cir. 1989).  McGuckin v. Smith, 974 F.2d 1050, 1059-60 (9th Cir. 1992), overruled on other

10  grounds, WMX Technologies v. Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc).

11         In Farmer v. Brennan, 511 U.S. 825, 114 S. Ct. 1970 (1994) the Supreme Court

12  defined a very strict standard which a plaintiff must meet in order to establish "deliberate

13  indifference."  Of course, negligence is insufficient.  Farmer, 511 U.S. at 835, 114 S. Ct. at 1978.

14  However, even civil recklessness (failure to act in the face of an unjustifiably high risk of harm

15  which is so obvious that it should be known) is insufficient.  Id. at 836-37, 114 S. Ct. at 1979.

16  Neither is it sufficient that a reasonable person would have known of the risk or that a defendant

17  should have known of the risk.  Id. at 842, 114 S. Ct. at 1981.

18         It is nothing less than recklessness in the criminal sense—a subjective standard—

19  disregard of a risk of harm of which the actor is actually aware.  Id. at 838-842, 114 S. Ct. at

20  1979-1981.  "[T]he official must both be aware of facts from which the inference could be drawn

21  that a substantial risk of serious harm exists, and he must also draw the inference."  Id. at 837,

22  114 S. Ct. at 1979.  Thus, a defendant is liable if he knows that plaintiff faces "a substantial risk

23  of serious harm and disregards that risk by failing to take reasonable measures to abate it."  Id. at

24  847, 114 S. Ct. at 1984.  "[I]t is enough that the official acted or failed to act despite his

25  knowledge of a substantial risk of serious harm."  Id. at 842, 114 S. Ct. at 1981.  If the risk was

26  obvious, the trier of fact may infer that a defendant knew of the risk.  Id. at 840-42, 114 S. Ct. at

1981.  However, obviousness per se will not impart knowledge as a matter of law.

Also significant to the analysis is the well established principle that mere differences of opinion concerning the appropriate treatment cannot be the basis of an Eighth Amendment violation.  Jackson v. McIntosh, 90 F.3d 330 (9th Cir. 1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

Moreover, a physician need not fail to treat an inmate altogether in order to violate that inmate's Eighth Amendment rights.  Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).  A failure to competently treat a serious medical condition, even if some treatment is prescribed, may constitute deliberate indifference in a particular case.  Id.

Additionally, mere delay in medical treatment without more is insufficient to state a claim of deliberate medical indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 408 (9th Cir. 1985).  Although the delay in medical treatment must be harmful, there is no requirement that the delay cause "substantial" harm.  McGuckin, 974 F.2d at 1060, citing Wood v. Housewright, 900 F.2d 1332, 1339-1340 (9th Cir. 1990) and Hudson, 112 S. Ct. at 998-1000.  A finding that an inmate was seriously harmed by the defendant's action or inaction tends to provide additional support for a claim of deliberate indifference; however, it does not end the inquiry.  McGuckin, 974 F.2d 1050, 1060 (9th Cir. 1992).  In summary, "the more serious the medical needs of the prisoner, and the more unwarranted the defendant's actions in light of those needs, the more likely it is that a plaintiff has established deliberate indifference on the part of the defendant."  McGuckin, 974 F.2d at 1061.

Superimposed on these Eighth Amendment standards is the fact that in cases involving complex medical issues where plaintiff contests the type of treatment he received, expert opinion will almost always be necessary to establish the necessary level of deliberate indifference.  Hutchinson v. United States, 838 F.2d 390 (9th Cir. 1988).  Thus, although there may be subsidiary issues of fact in dispute, unless plaintiff can provide expert evidence that the treatment he received equated with deliberate indifference thereby creating a material issue of

1   fact, summary judgment should be entered for defendants.  The dispositive question on this

2   summary judgment motion is ultimately <u>not</u> what was the most appropriate course of treatment

3   for plaintiff, but whether the failure to timely give a certain type of treatment was, in essence,

4   criminally reckless.

5                   *Defendants' Facts*

6             Defendants filed a statement of undisputed facts in support of their summary

7   judgment motion.  Because plaintiff's opposition does not directly address defendants' facts, it is

8   difficult for the court to set forth a statement of undisputed facts for both parties.  Accordingly,

9   the court will set forth defendants' material facts below, which are supported by their exhibits.

10   The court will discuss plaintiff's evidence below to the extent it disputes defendants' evidence.

11             Plaintiff entered the correctional system in March 1996 with a variety of medical

12   problems including hepatitis, abdominal distress, back pain and seizures.  Defendants' Exhibit B,

13   Sainz declaration, ¶ 3.  In April 1999 plaintiff transferred to Mule Creek State Prison weighing

14   151 pounds.  Defendants' Exhibit C, Douglas declaration ¶ 4.  On April 20, 1999, defendant

15   Bulanon ordered a maintenance treatment plan for plaintiff which included interferon, dilantin,

16   zoloft, loxitane, food supplements and a mental health followup.  Defendants' Exhibit I, pp. 19,

17   75.  During the remainder of 1999, plaintiff was seen on a monthly basis by either Dr. Bulanon or

18   Dr. Busi.  Defendants' Exhibit B, Sainz declaration, ¶ 7.

19             On August 8, 1999, an upper series GI was performed on plaintiff.  <u>Id.</u>  The results

20   were normal with no duodenal polyp seen.  <u>Id.</u>  On September 15, 1999, a neurological

21   examination was performed by the yard physician.  <u>Id.</u>  No neurological deficits and no bowel or

22   bladder dysfunction were found.  <u>Id.</u>  The treatment plan was to follow-up and make a

23   neurosurgeon referral if the neurological signs and symptoms arose.  <u>Id.</u>

24             On January 10, 2000, doctor Busi made a request for a gastroenterology

25   consultation follow-up with Dr. Sogge, a gastroenterology consultant.  <u>Id.</u>, ¶ 8.  On February 14,

26   2000, Dr. Sogge saw plaintiff for a telemedicine consultation.  <u>Id.</u>, ¶ 9.  As a result of this

consultation, plaintiff's interferon treatment was discontinued.  Id.   Plaintiff continued to be seen by Dr. Sogge about once a month for telemedicine consultations.  Id., ¶ 10.

Plaintiff's July 13, 2000, liver function test for hepatitis C was normal.  Id. Plaintiff was advised that his liver function tests would be checked every six months.  Id. Plaintiff was told that a combination treatment therapy of interferon with ribivarin required special approval from the Health Care Services Division.  Id.  The issue was to be re-addressed if his next six month liver function tests were elevated.  Id.

On August 28, 2000, Dr. Sogge performed an oral endoscopy on plaintiff.  Id., ¶ 11.  Dr. Sogge documented that plaintiff had a small hiatal hernia with significant gastroesophagel reflux disorder.  Id.  Dr. Sogge found significant gastric esphagitis.  Id.  No strictures were noted.  Id.  Dr. Sogge changed plaintiff's medication to Prilosec.  Id.

On September 18, 2000, defendant Douglas reviewed plaintiff's Health Record for the purpose of responding to his inmate appeal, no. 00-02020, in which he complained of vomiting, nausea, GERD and weight loss.  Defendants' Exhibit C, Douglas declaration, ¶ 3.  In this appeal, plaintiff requested to be fed in his cell.  Id.  Defendant Douglas determined that in-cell feeding was not clinically necessary.  Id., 10.  Defendant Douglas based this decision on the following factors.  At the time of his transfer to MCSP, plaintiff's weight was 151 pounds.  Id., ¶ 4.  On January 10, 2000, plaintiff weighed 170 pounds.  Id., ¶ 8.  Plaintiff has been referred to Dr. Sogge, the gastroenterologist, for evaluation.  Id., ¶ 6.  On August 28, 2000, Dr. Sogge diagnosed plaintiff with gastroesphagel reflux with mild esophagitis and no stricture.  Id., ¶ 7.  An upper GI series on August 12, 2000, confirmed minor radiological findings, consistent with gatroesophagel reflux.  Id., ¶ 9.

Defendant Sainz's first involvement with plaintiff was approving the first and second level appeal responses to appeal no. 00-02020.  Defendants' Exhibit B, Sainz declaration, ¶ 12.

/////

1   On October 30, 2000, defendant Douglas reviewed plaintiff's Health Record and

2   responded to his appeal no. 00-02754, submitted on October 22, 2000.  Defendants' Exhibit C,

3   Douglas declaration,  ¶ 11.  In this appeal, plaintiff claimed that he had been experiencing

4   abdominal pain, vomiting and weight loss for the past four years.  Id., ¶ 12.  Plaintiff requested

5   medically disabled status.  Id.

6   In his review of plaintiff's record, defendant Douglas noted that plaintiff had

7   hepatitis C.  Id., ¶ 13.  While at CSP-Sac on or around 1998, plaintiff was referred to Dr. Sogge

8   whose concern was about cholelithiasis because of the extraordinary pain expressed by plaintiff

9   and attributed to hepatitis C.  Id., ¶ 14.  A November 26, 1998, ultrasound disclosed a normal

10  gallbladder, no stones, normal pancreas and normal kidneys.  Id., ¶ 15.  Plaintiff continued to

11  complain of pain and an additional evaluation to exclude peptic ulcer disease of occult cancer

12  was initiated.  Id., ¶ 15.  Upper GI series and barium enemas were normal.  Id.  Further

13  evaluation by Dr. Sogge suggested that the pain was exaggerated and without significant

14  pathology.  Id., ¶ 16.

15  In the review of plaintiff's records, defendant Douglas noted that plaintiff's

16  interferon therapy had been stopped because it was not effective, but that it appeared to have

17  resolved hepatic inflammation.  Id., ¶ 18.  On September 28, 2000, defendant Douglas had seen

18  plaintiff for weight loss.  Id., ¶ 19.  Defendant Douglas determined that there was no documented

19  weight loss.  Id., ¶ 20.  Plaintiff's weight in October 1999 was 165 pounds. Plaintiff's weight was

20  163 pounds on September 28, 2000.  Id.  Defendant Douglas also evaluated plaintiff's back pain,

21  and determined that it was anatomically inconsistent with his claimed injury and prior C-spine

22  MRI scan from October 1999.  Id., ¶ 21.  Defendant Douglas's evaluation of plaintiff failed to

23  disclose muscular atrophy, gait disturbance or apparent weakness.  Id., ¶ 37.  Defendant Douglas

24  advised plaintiff that his liver function studies were, at that time, normal.  Id., ¶ 22.

25  Defendant Douglas determined that plaintiff's request for medically disabled

26  status contained in appeal 00-02754 was not supported by his clinical examination.  Id., ¶ 27.

9

1   Defendant Douglas determined that there were no current findings which would justify medical

2   unassignment; although no functional disability was found, a consultation with an orthopedic

3   surgeon was requested to ensure no musculoskeletal basis for his claim of disability. Id., ¶ 27.

4         Defendant Sainz approved the first level appeal response to appeal no. 00-2754.

5   Defendants' Exhibit B, Sainz declaration, ¶ 13. Defendant Sainz interviewed and examined

6   plaintiff in connection with his second level response to this appeal. Id. On December 28, 2000,

7   defendants Sainz and Nelson interviewed plaintiff. Id. During the interview, plaintiff's

8   complaints centered around his abdominal pain, his back pain and his placement on disability

9   status. Id. Plaintiff requested to be permanently medically disabled, retain his A1/A earning

10  status, be cell fed and have his medical file fully reviewed. Id.

11        Defendant Nelson was present during the December 2000 interview in her

12  capacity as the inmate appeals coordinator. Id., ¶ 13, 15. Defendant Nelson cannot and did not

13  prescribe medical treatments or diagnostic procedures. Id.

14        In responding to plaintiff's appeal, defendant Sainz observed that on August 28,

15  2000, Dr. Sogge diagnosed plaintiff as having a hiatal hernia, which explained his

16  gastrointestinal symptoms. Id., ¶ 16. Plaintiff's hepatitis C was being checked every six months.

17  Id. Plaintiff was receiving appropriate medication and had gained 19 pounds since his arrival at

18  MCSP. Id.

19        In responding to the appeal, defendant Sainz considered that plaintiff's cervical

20  stenosis was to be further evaluated. Id., ¶ 17. Defendant Sainz advised plaintiff that an MRI of

21  his cervical spine would be ordered. Id. Defendant Sainz advised plaintiff that if a significant

22  difference was found, further evaluation would be done. Id. Finally, defendant Sainz advised

23  plaintiff that a consultation with the in-house neurologist would be requested regarding his back

24  problems. Id.

25  /////

26  /////

1        On December 28, 2000, defendant Sainz performed a physical examination of

2   plaintiff.  Id., ¶ 18.  Defendant Sainz did not agree with plaintiff's self-assessment of mobility

3   impairment.  Id.  Plaintiff was able to perform major life activities and was not suitable for

4   disability status.  Id.

5        On January 21, 2001, defendant Douglas responded to plaintiff's ADA Request

6   Log # 00-3255, submitted December 7, 2000, in which he claimed to be disabled because of

7   spinal stenosis, bulging discs, arthritis, hepatitis C virus and chronic digestive disorder.

8   Defendants' Exhibit C, Douglas declaration, ¶ 32.  Plaintiff requested a cane, classification as

9   medically disabled, a lower tier/lower bunk chrono and to be permanently fed in his cell.  Id., ¶

10  33.  Defendant Douglas responded by saying that this request was a reiteration of the prior appeal

11  to which a response had been given.  Id., ¶ 34.

12       In January 2001, Dr. Leary, an orthopedic consultant, examined plaintiff.  Id., ¶

13  20.  Plaintiff's complaints were neck, thoracic, lumbar and left hip pain.  Id.  Plaintiff presented a

14  long history of multiple injuries, limited activity and symptoms gradually worsening.  Id.  Dr.

15  Leary's impression was of degenerative changes in the cervical spine, a mild compression

16  fracture and degenerative disc disease at the lumbrosacral junction.  Id., 21.  Dr. Leary was

17  reluctant to advise any surgical procedure and recommended that plaintiff continue as is, and see

18  whether he would have a surgical procedure on his neck.  Id.

19       An evaluation by Dr. Lustman on January 3, 2001, suggested the possibility of

20  cervical radiculopathy, which does not anatomically contribute to mobility deficit.  Defendants'

21  Exhibit C, Douglas declaration, ¶ 41.  As a result of Dr. Lustman's findings, further evaluation of

22  plaintiff's cervical nerve findings were recommended and a lower bunk/lower tier chrono was

23  issued for the duration of his evaluation.  Id.

24       At defendant Sainz's request, plaintiff had an MRI of his cervical spine on

25  February 5, 2001.  Id., ¶ 23.  The results showed minimal central spinal stenosis between the C4

26  and C6 levels, moderate herniation of C4-5 disk with significant compression on the left side of

the cervical spinal cord; and a moderate bulge of C5-6 disk with minimal compression of the anterior cord.  Id.  There was no evidence of cord edema to suggest myleopathy.  Id.

In March 2001, plaintiff was prescribed interferon and ribivarin combination treatment for his hepatitis C.  Defendants' Exhibit I, p. 103.

On May 7, 2001, plaintiff had an MRI of his lumbar spine.  Defendants' Exhibit B, Sainz Declaration, ¶ 24.  The results showed a large central disk protrusion at the L4-5 level, creating narrowing and spinal canal stenosis, and moderate disk disease and desiccation at the L5-S1 level, with no canal stenosis or narrowing.  Id., ¶ 24.

On September 27, 2001, Dr. Smith issued plaintiff a lower bunk, lower tier, cane and extended medical lay-in chrono, pending back surgery.  Id., ¶ 25.  Dr. Smith also indicated that plaintiff was mobility impaired.  Id.

On October 1, 2001, plaintiff complained to defendant Bulanon of pain.  Defendants' Exhibit C, Douglas declaration, ¶ 58.  Defendant Bulanon denied plaintiff's request to discontinue interferon treatment, explaining that it was Dr. Sogge's decision.  Id., ¶ 59.  Defendant Bulanon discussed plaintiff's pending surgery and his pain medication.  Id., ¶ 60.  Defendant Bulanon prescribed Zantact for three months.  Id., ¶ 61.  On September 6, 2001, defendant Douglas had prescribed acetaminophen twice daily for plaintiff's pain for thirty days.  Defendants' Exhibit I, p. 111.

Prior to the October 18, 2001, surgery, defendant Douglas extended plaintiff's pain medication by one week.  Defendants' Exhibit C, Douglas declaration, ¶ 45.  On September 15, 2001, plaintiff submitted a letter to the Chief Physician claiming a consultant's recommendation for high dose Baclofen and Oxy-Contin because of back pain.  Id., ¶ 47.  Defendant Douglas could not verify that plaintiff had a consultant's recommendation for high doses of narcotics and plaintiff could not provide any documentation to support his claim.  Id., ¶ 48.  Defendant Douglas then wrote a drug-seeking chrono regarding plaintiff.  Id., ¶ 49.

/////

12

On October 1, 2001, plaintiff filed an administrative appeal asking that the chrono prepared by defendant Douglas be withdrawn. Defendants' Exhibit E, p. 28. Plaintiff argued that he had been authorized to have the high doses of narcotics. Id. Dr. Williams, who is not a defendant, interviewed plaintiff in response to the appeal. Id., p. 29. In his response Dr. Williams stated that plaintiff would receive the proper pain medication, but that a physician would recalculate and adjust the medication at his discretion. Id. Dr. Williams denied plaintiff's request for dismissal of the chrono. Id. Defendant Sainz approved Dr. Williams's response. Id.

On October 1, 2001, plaintiff filed an administrative appeal stating that on September 12, 2001, he had a surgical consultation with Dr. Remington who told him that his two options were non-surgical physical therapy with heavy pain medication or surgery. Id., pp. 38-39. Plaintiff stated that he told defendant Bulanon that he wanted to try the non-surgical procedure first. Id., p. 39. Defendant Bulanon denied plaintiff's request, stating that the surgery was already scheduled. Id., p. 39. Defendant Douglas responded to plaintiff's appeal on November 9, 2001, stating that plaintiff's request regarding the surgery had been superseded by his acceptance of the surgery and the performance of it on October 18, 2001. Id., p. 40. Defendant Sainz approved defendant Douglas's response to this appeal. Id., p. 38.

On October 18, 2001, plaintiff had surgery at Doctors Medical Center in Modesto, California. Defendants' Exhibit C, Sainz declaration, ¶ 26. The surgical procedures were an L3 and L4 decompressive laminectomy and an L4-5 diskectomy and foraminotomy. Id.

On December 17, 2001, defendant Douglas issued a permanent mobility impairment chrono based on plaintiff's recent back surgery. Defendants' Exhibit C, Douglas declaration, ¶ 29. On December 28, 2001, plaintiff had another MRI of his cervical spine for comparison with his February 5, 2001, MRI. Id. The results showed the presence of disk disease in the lower cervical spine. Id. At the C5-6 and C4-5 levels there was evidence of spinal canal stenosis, more pronounced at the C5-6 level. Id., ¶ 30.

/////

13

On February 12, 2002, plaintiff again underwent surgery at Doctors Medical Center in Modesto, California.  Id., ¶ 31.  The surgical procedures performed were a C5-6 cervical discectomy with fusion, arthrodesis using allograft bone and Symphony and anterior instrumentation using a blackstone plate and four screws.  Id.

Plaintiff was transferred to the California Substance Abuse and Treatment Facility (SATF) in April 2002, and returned to MCSP on November 26, 2003.  Defendants' Exhibit C, Douglas declaration, ¶ 52.  At the time of his transfer to SATF, plaintiff's weight was stable at 180 pounds.  Id.  Upon his return to MCSP, plaintiff weighed 210 pounds.  Id., ¶ 24.

On February 23, 2003, plaintiff underwent a neurological examination by Dr. Viravathana for his seizure disorder.  Id., ¶ 53.  Dr. Viravathana recommended that the Tegretol and Neurontin medication should be continued, but if the seizures were not well controlled, the blood level of Tegretol should be monitored.  Id.  As for plaintiff's back pain, a non-steroidal anti-inflammatory medication, such as Celebrex, was recommended.  Id.

*Defendants Douglas*, *Smith and Bulanon: ¶ 31, 33, 36, 37*

Defendants Douglas, Smith and Bulanon are all medical doctors.  Plaintiff alleges that defendants Douglas and Smith denied his requests for medical care for his eating and gastrointestinal difficulties.  Amended Complaint, ¶ 31.  Plaintiff alleges that defendant Douglas failed to provide proper treatment to plaintiff for his hepatitis C, spinal and back problems and notable weight loss from gastro-difficulties.  Id., ¶ 33. Plaintiff alleges that defendant Bulanon refused to perform a pre-surgery examination of plaintiff prior to herniated disc lumbar surgery.  Id., ¶ 36.  Plaintiff alleges that defendant Bulanon denied plaintiff pain medication.  Id.  Plaintiff alleges that defendant Douglas prescribed inadequate pain medication.  Id.  Plaintiff alleges that defendant Douglas denied him pain medication for his herniated lumbar disc.  Id., ¶ 37.  Plaintiff alleges that following his disc surgery, defendant Douglas refused to treat plaintiff's infection.  Id.

/////

1    Defendants argue that they are entitled to summary judgment on grounds that they

2 did not act with deliberate indifference.  At the outset, the court observes that in support of his

3 opposition plaintiff submitted declarations from several prisoners discussing their observations

4 of plaintiff's physical state.  Plaintiff's Opposition, Exhibit B.  These prisoners are not medical

5 experts.  Therefore, the court may not consider these declarations in evaluating whether

6 defendants provided plaintiff constitutionally inadequate medical care.

7    The record herein is the antithesis of deliberate indifference.  Plaintiff evidently

8 believes that the failure to cure, or for medical personnel to disagree with plaintiff's medical

9 opinions, is per se deliberate indifference.  Neither situation comes close to an Eighth

10 Amendment violation.  The court first considers the claims against defendant Bulanon.

11    Plaintiff's claims against defendant Bulanon are apparently based on defendant's

12 October 1, 2001, examination of plaintiff.  Plaintiff argues that defendant Bulanon refused to

13 perform a pre-surgery examination and denied his request for pain medication.

14    Defendants' evidence indicates that on October 1, 2001, defendant Bulanon

15 discussed the pending surgery with plaintiff, which was performed on October 18, 2001.  Other

16 than his own supported non-expert opinion, plaintiff has presented no expert evidence

17 demonstrating that defendant Bulanon's October 1, 2001, examination was constitutionally

18 inadequate.  Plaintiff has not demonstrated, for example, that his surgery was negatively

19 impacted as a result of an inadequate examination performed by defendant Bulanon.  The fact

20 that the surgery was performed despite defendant Bulanon's alleged failure to conduct an

21 adequate pre-surgery examination undermines plaintiff's claim.  The court has also reviewed the

22 medical records submitted by plaintiff in support of his opposition and finds no evidence

23 supporting this claim.  See Plaintiff's Opposition, Exhibit A.  Accordingly, the court

24 recommends that defendant Bulanon be granted summary judgment as to this claim.

25    As discussed above, on October 1, 2001, plaintiff had a prescription for pain

26 medication because on September 6, 2001, defendant Douglas had prescribed acetaminophen

1   twice daily for plaintiff for thirty days.  Although not cited in defendants' statement of

2   undisputed facts, the court observes that plaintiff's medical records also indicate that defendant

3   Douglas had prescribed Baclofen for plaintiff during this time.  Defendants' Exhibit I, pp. 197-

4   206.  Because plaintiff already had a prescription for pain medication, the court does not find that

5   defendant Bulanon acted with deliberate indifference by not ordering more pain medication for

6   plaintiff on October 1, 2001.

7           Plaintiff argues that defendant Smith denied his requests for medical care for his

8   eating and gastrointestinal difficulties, although he does not specifically identify the dates.  The

9   evidence before the court indicates that defendant Smith was involved in plaintiff's care on two

10  occasions.  Defendants have presented evidence demonstrating that on September 27, 2001, Dr.

11  Smith issued plaintiff a lower bunk, lower tier, cane and extended medical lay-in chrono, pending

12  back surgery.  In the chrono, Dr. Smith also indicated that plaintiff was mobility impaired.  In

13  support of his opposition, plaintiff has submitted a document dated on or around March 8, 2001,

14  in which defendant Smith approved the request for plaintiff to receive a Lumbar MRI and

15  neurosurgical evaluation.  Plaintiff's Opposition, Exhibit B, p. 23.  This evidence does not

16  demonstrate that defendant Smith acted with deliberate indifference to plaintiff's eating and

17  gastrointestinal difficulties.

18          In his declaration filed in support of his opposition, plaintiff states that he has

19  "suffered these gastro-problems for years, with documentation in his medical file sufficient to

20  warrant more than over the counter antacid tablets, which is all defendant Smith...would give

21  him."  Plaintiff's Declaration filed October 26, 2006, p. 3.  The medical records indicate that

22  defendant Smith treated plaintiff for his back problems rather than his gastrointestinal problems.

23  Assuming that defendant Smith did prescribe antacids, plaintiff has presented no expert medical

24  evidence demonstrating that such prescription was inappropriate.  Because plaintiff has failed to

25  demonstrate that defendant Smith acted with deliberate indifference to his gastrointestinal

26  problems, the court recommends that defendant Smith be granted summary judgment.

1    Plaintiff's claims against defendant Douglas are based on his failure to adequately

2    treat all of plaintiff's medical problems: eating and gastrointestinal problems, weight loss,

3    hepatitis C, back problems, pain medication, treatment of infection following surgery.

4    Plaintiff challenges defendant Douglas's September 18, 2000, denial of his

5    request to be cell fed.  Plaintiff argued that his gastrointestinal problems and weight loss required

6    him to be cell fed.  Defendants' evidence demonstrates that defendant Douglas based this

7    decision on the following factors: 1) at the time of his transfer to MCSP, plaintiff's weight was

8    151 pounds, and on January 10, 2000, plaintiff weighed 170 pounds; 2) plaintiff has been

9    referred to Dr. Sogge, the gastroenterologist, for evaluation and on August 28, 2000, Dr. Sogge

10   diagnosed plaintiff with gastroesphagel reflux with mild esophagitis and no stricture; 3) an upper

11   GI series on August 12, 2000, confirmed minor radiological findings, consistent with

12   gatroesophagel reflux.

13   Plaintiff has offered no expert evidence supporting his claim that defendant

14   Douglas's decision to deny him in-cell feeding was not medically sound.  Defendant Douglas's

15   decision to deny plaintiff's request to be cell fed was based on his review of plaintiff's medical

16   record, which he determined did not warrant in cell feeding.  The court observes that Dr. Sogge

17   found significant gastric esophagitis, and defendant Douglas stated that Dr. Sogge found mild

18   esophagitis.  This inaccurate statement does not demonstrate deliberate indifference.  Based on

19   the record, the court does not find that defendant Douglas acted with deliberate indifference

20   when he denied plaintiff's request to be cell fed.

21   Plaintiff challenges defendant Douglas's October 30, 2000, appeal denying his

22   request for medically disabled status.  The only evidence offered by plaintiff in support of his

23   claim that he required disability concerns his back problem.  Accordingly, the considers only

24   whether plaintiff's back problem warranted permanent disability status.

25   On December 17, 2001, defendant Douglas issued a permanent mobility

26   impairment chrono to plaintiff based on his back surgery.  In order to evaluate plaintiff's claim

1  that defendant Douglas should have issued the disability chrono in October 2000, the court will

2  summarize the relevant evidence.

3          Defendants' evidence shows that in October 2000 defendant Douglas found that

4  plaintiff's back problems did not warrant permanent disability status because he determined that

5  plaintiff lacked muscular atrophy, gait disturbance or apparent weakness.  In addition, defendant

6  Douglas determined that plaintiff's back pain was anatomically inconsistent with his claimed

7  injury and prior C-spine MRI scan from October 1999.  Despite these findings, defendant

8  Douglas ordered that plaintiff receive a consultation with an orthopedic surgeon to ensure that

9  there was no musculoskeletal basis for plaintiff's claim of disability.

10          In his declaration submitted in support of his opposition, plaintiff states that the

11  results of all his MRI's, which were in his medical file, supported his claims of severe pain.

12  Plaintiff's declaration, p. 1.  Plaintiff states that the MRI's showed severe spinal impairment,

13  causing crippling pain and disability.  Id., p. 2.  Plaintiff claims that he had an ADA Form 1845

14  from Dr. Mitchell at California State Prison-Sacramento reflecting permanent mobility

15  impairment due to spinal disease based on plaintiff's 1994 MRI.  Id., p. 2.

16          The medical records submitted by plaintiff regarding his back problems include a

17  March 25, 1996, order from a doctor at Deuel Vocational Institution for plaintiff to be placed on

18  light duty based on a ruptured disc and seizure disorder.  Plaintiff's Exhibit A, p. 4.  Plaintiff also

19  includes MRI reports from May 2, 1994, and October 28, 1994, performed at Mercy Plaza

20  Imaging Center in Sacramento, California.  Id., pp. 6-12.  Plaintiff also includes a form prepared

21  in 1998 by Dr. Mitchell stating that plaintiff is permanently mobility impaired.  Id., p. 15.

22          While plaintiff had disability status based on his back problem at CSP-

23  Sacramento prior to his transfer to DVI, the standard for an Eighth Amendment claim is not what

24  was correct at one prison must be correct at another prison.  If this were the case, then once an

25  adverse medical decision were made, then no other doctor could disagree with the decision

26  without violating the Constitution.  As discussed above, the standard for an Eighth Amendment

1   claim is deliberate indifference.  At most, plaintiff has presented evidence of a difference of

2   opinion between Dr. Mitchell and defendant Douglas.  Plaintiff has presented no expert evidence

3   demonstrating that his back condition in October 2000 warranted disability status.  The court

4   cannot draw the inference from Dr. Mitchell's decision to grant plaintiff disability status in 1998

5   that plaintiff's back condition two years later continued to warrant this status.

6          The evidence demonstrates that in October 2000, defendant Douglas did not act

7   with deliberate indifference when he denied plaintiff's request for disability status.  Defendant

8   Douglas made his decision based on his physical examination of plaintiff as well as his review of

9   a 1999 MRI.  Defendant went on to refer plaintiff to an orthopedic surgeon to make sure that no

10  musculoskeletal basis for his claim of disability existed.  Defendant Douglas did not disregard

11  plaintiff's medical needs and plaintiff has presented no expert evidence in support of this claim.

12          Plaintiff next alleges that defendant Douglas failed to provide him with adequate

13  pain medication.  In his declaration filed in support of his opposition, plaintiff argues that on

14  October 11, 2001, *after* his surgery, defendant denied him pain medication.

15          Defendants' evidence indicates that on September 6, 2001, defendant Douglas had

16  prescribed acetaminophen twice daily for plaintiff's pain for thirty days.  Prior to plaintiff's back

17  surgery, defendant Douglas extended plaintiff's pain medication by one week.  Plaintiff's

18  medical records also indicate that defendant Douglas prescribed Baclofen for plaintiff from

19  October 8, 2001, to February 5, 2002.  Defendants' Exhibit I, p. 201.

20          In addition, plaintiff's back surgery was on October 18, 2001.  The first entry in

21  plaintiff's medical records following his return to prison following the surgery on October 29,

22  2001, state that he was prescribed Tylenol at his own request.  Defendants' Exhibit I, p. 53.  The

23  entry appears to have been made by defendant Douglas.  Id.

24          Plaintiff's claim that defendant Douglas failed to provide him with pain

25  medication is not supported by the record.  Accordingly, the court does not find that defendant

26  Douglas acted with deliberate indifference to plaintiff's pain.

19

1    Plaintiff may also be challenging defendant Douglas's denial of his request for

2    high dosages of Baclofen and Oxy-Contin.  Defendant Douglas denied plaintiff's request for high

3    doses of these narcotics prior to his surgery because he could not verify that plaintiff had a

4    consultant's recommendation for these drugs.  Plaintiff has presented no evidence that he actually

5    had a prescription for these drugs in the dosages he sought.  A failure to authorize drugs that

6    were not prescribed does not constitute deliberate indifference.

7    Plaintiff generally alleges that defendant Douglas failed to adequately treat his

8    gastrointestinal problems and hepatitis C.  In his declaration filed in support of his opposition,

9    plaintiff states that defendant Douglas only treated his gastrointestinal problems with antacid

10   tablets.  Plaintiff's declaration, p. 3.  The evidence indicates that defendant Douglas's primary

11   interaction with plaintiff was his review of administrative appeals.  The evidence indicates that

12   Dr. Sogge, the gastroenterologist, treated plaintiff for his gastrointestinal problems.  In any event,

13   assuming defendant Douglas prescribed antacid tablets, plaintiff has offered no expert evidence

14   that these medications were not medically warranted.  Accordingly, the court finds that there is

15   no evidence that defendant Douglas acted with deliberate indifference in treating plaintiff's

16   gastrointestinal problems.

17   The record contains no evidence demonstrating that defendant Douglas acted with

18   deliberate indifference to plaintiff's hepatitis C.  The evidence shows that when plaintiff arrived

19   at MCSP, defendant Bulanon ordered a maintenance treatment plan which included interferon.

20   In February 2000, Dr. Sogge discontinued the interferon treatment.  Plaintiff's liver function was

21   regularly tested.  In March 2001 plaintiff was prescribed interferon and ribivarin for his hepatitis.

22   In his declaration, plaintiff states that while his liver panels were normal, his

23   blood work showed his liver "pumping out extremely high viral loads."  Plaintiff's Declaration,

24   p. 9.  The court does not understand this statement, and plaintiff offers no expert evidence to

25   support his claim that the treatment he received for his hepatitis was constitutionally inadequate.

26   \\\\\

1    Finally, plaintiff argues that defendant Douglas failed to treat him for an infection

2 following his back surgery.  The first entry in plaintiff's medical records following his return to

3 prison from surgery, dated October 29, 2001, states that plaintiff was concerned about an

4 infection in the wound.  Defendants' Exhibit I, p. 53.  The entry also states that there was good

5 evidence of recovery from the surgery.  Id.  The October 29, 2001, entry appears to have been

6 made by defendant Douglas.  The next entry, dated November 9, 2001, states that the back area

7 was clear with no redress noted.  Id.  The entry states that the area was healing well.  Id.  This

8 entry was not made by defendant Douglas.

9    Plaintiff's claim that he had an untreated infection is not supported by his medical

10 records.  If plaintiff had an infection on October 29, 2001, which defendant Douglas failed to

11 treat, the November 9, 2001, entry stating that the area was clean and healing well is

12 inexplicable.  Because plaintiff's claim that defendant Douglas failed to treat his infection is not

13 supported by the evidence, defendant Douglas should be granted summary judgment as to this

14 claim.

15    Accordingly, for the reasons discussed above, the court recommends that

16 defendants Bulanon, Smith and Douglas be granted summary judgment.

17    *Defendants Sainz, Nelson: ¶ 30, 34*

18    Defendant Sainz is a medical doctor.  Defendant Nelson is an appeals analyst.

19    The court first considers plaintiff's claims against defendant Sainz.  Plaintiff's

20 first claim against defendant Sainz concerns his December 2000 examination of plaintiff and

21 decision to uphold defendant Douglas's decision finding that plaintiff did not quality for medical

22 disability status.  Defendant Sainz based his decision on his review of plaintiff's medical records

23 and his physical examination of plaintiff.  Following his examination of plaintiff, defendant

24 Sainz told plaintiff that he would be receiving an MRI and a consultation with a neurologist,

25 which plaintiff received.  Plaintiff has offered no expert evidence demonstrating that defendant

26 Sainz acted with deliberate indifference in denying his appeal requesting disability status.

1       In his opposition, plaintiff argues that defendant Sainz kept him from a

2  neurosurgeon for two years.  The evidence shows that in January 2001 plaintiff had an orthopedic

3  consultation with Dr. Leary.  In February 2001 plaintiff had an MRI.  In May 2001 plaintiff had

4  another MRI.  In October 2001 plaintiff had surgery on his back.  In February 2002 plaintiff had

5  another surgery on his back.  Plaintiff's claim that defendant Sainz denied him surgery is not

6  supported by the record.

7       Plaintiff also claims that defendant Sainz denied him treatment for his hepatitis C

8  and refused him pain medication.  As discussed above, the record demonstrates that plaintiff's

9  hepatitis C was treated and that he was prescribed pain medication.  Plaintiff has offered no

10  expert evidence demonstrating that the treatment he received for hepatitis C or pain was

11  constitutionally inadequate.

12       As to defendant Nelson, defendants argue that she is not a doctor and could not

13  prescribe medical treatments or diagnostic procedures for plaintiff.  Rather, she appeared at

14  plaintiff's December 2000 interview with defendant Sainz in her capacity as the appeals

15  coordinator.  The court agrees that defendant Nelson did not have the authority to order medical

16  treatment for plaintiff because she is not a medical doctor.  Rather, the decisions regarding

17  plaintiff's treatment following the December 2000 interview and examination were made by

18  defendant Sainz, who is a medical doctor.  Accordingly, the court recommends that defendant

19  Nelson be granted summary judgment.

20       2. Retaliation

21       In order to succeed on a claim of retaliation, plaintiff must demonstrate five

22  elements: 1) an assertion that a state actor took some adverse action against him 2) because of 3)

23  the prisoner's protected conduct, and that such action, 4) chilled the inmates's exercise of his

24  First Amendment rights, and 5) the action did not reasonably advance a legitimate correctional

25  goal.  Rhodes v. Robinson, 408 F.3d 559, 567 (9th Cir. 2005).  If the prisoner does not allege a

26  chilling effect, allegations that he suffered more than minimal harm will almost always have a

1 chilling affect.  Id., no. 11.

2       Plaintiff argues that defendant Douglas retaliated against him for requesting high

3 dosages of Baclofen and Oxy-Contin by placing a drug-seeking chrono in his file.  Plaintiff

4 claims that he had a consultant's recommendation for these drugs.  As discussed above, there is

5 no evidence that plaintiff had a recommendation or prescription for Baclofen or Oxy-Contin.

6 Therefore, defendant Douglas's decision to place the chrono in plaintiff's file promoted

7 legitimate correctional goals.  The chrono alerted other physicians that plaintiff may be seeking

8 narcotics that he was not authorized to possess.  Accordingly, defendant Douglas should be

9 granted summary judgment as to this claim.

10       Plaintiff argues that defendant Williams recommended his transfer to SATF in

11 retaliation for his legal activities.  Defendants argue that plaintiff was transferred to SATF

12 because of his mobility problems.  In his declaration filed in support of the pending motion,

13 defendant Williams states that on January 29, 2002, he and the other classification committee

14 members elected to refer plaintiff for endorsement to SATF with MCSP Level III Sensitive

15 Needs Yard as an alternative based upon the verification of his mobility impairment by Dr.

16 Smith.  Defendants' Exhibit G, ¶ 6.  Defendant Williams states that the decision to transfer

17 plaintiff to SATF was based solely on him being a mobility impaired Level III sensitive needs

18 inmate who could not be housed at MCSP.  Id., ¶ 7.  The classification committee report states

19 that at that time, SATF was the only prison that could house a mobility impaired, Level III,

20 sensitive needs inmate.  Id., attachment 1.

21       In his declaration, plaintiff states that his transfer to SATF was inappropriate

22 because he was a Level III inmate and SATF was a Level IV prison.  Plaintiff's declaration, p.

23 14.  Plaintiff also states that he was not ADA disabled.  Id.  Plaintiff does not dispute that he was

24 a sensitive needs inmate.  Plaintiff also does not dispute that he had been declared mobility

25 impaired.  While plaintiff may have been a Level III inmate, he offers no evidence countering

26 defendants' evidence that SATF was the only prison at the time that could house a Level III,

1  sensitive needs disabled inmate.

2        Because the evidence demonstrates that defendant Williams's decision to

3  recommend plaintiff's transfer to SATF was based on a legitimate correctional goal, i.e. SATF

4  was the only prison at that time that could house an inmate with plaintiff's needs, the court

5  recommends that he be granted summary judgment.

6  III.  Failure to Exhaust Administrative Remedies

7        Defendants move to dismiss the claims against defendants Burton, Allen and

8  Todd based on plaintiff's failure to exhaust administrative remedies as to these defendants.

9        42 U.S.C. § 1997e(a) provides that, "[n]o action shall be brought with respect to

10  prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in

11  any jail, prison, or other correctional facility until such administrative remedies as are available

12  are exhausted."  In order for California prisoners to exhaust administrative remedies, they must

13  proceed through several levels of appeal:  1) informal resolution, 2) formal written appeal on a

14  CDC 602 inmate appeal form, 3) second level appeal to the institution head or designee, and

15  4) third level appeal to the Director of the California Department of Corrections.  Barry v.

16  Ratelle, 985 F. Supp. 1235, 1237 (S.D. Cal. 1997) (citing Cal. Code Regs. tit. 15, § 3084.5).  A

17  final decision from the Director's level of review satisfies the exhaustion requirement.  Id. at

18  1237-38.

19        In Booth v. Churner, 121 S. Ct. 1819 (2001) the Supreme Court held that inmates

20  must exhaust administrative remedies, regardless of the relief offered through administrative

21  procedures.  121 S. Ct. at 1825.  Therefore, inmates seeking money damages must completely

22  exhaust their administrative remedies.  42 U.S.C. § 1997e(a) provides that no action shall be

23  brought with respect to prison conditions *until* such administrative remedies as are available are

24  exhausted.  McKinney v. Carey, 311 F.3d 1198 (9th Cir. 2002).

25        Plaintiff claims that in July 2004 defendant Todd provided inadequate medical

26  care.  Amended Complaint, ¶ 43.  Defendants observe that plaintiff filed this action on May 4,

2004.  Therefore, plaintiff could not have exhausted his administrative remedies against defendant Todd *prior* to filing this action.  <u>McKinney v. Carey</u>, 311 F.3d 1198 (9th Cir. 2002). On this ground, the court recommends that the claims against defendant Todd be dismissed.

Plaintiff alleges that defendants Burton and Allen retaliated against him for his legal activities by destroying and confiscating his legal and personal property.  Amended Complaint, pp. 18-19.  Defendants state that there is no record in MCSP's inmate appeal record keeping system that plaintiff filed an inmate appeal, on or before May 4, 2004, alleging that defendants Burton or Allen retaliated against him.  Defendants' Exhibit H, ¶ 5.  Nor is there any record in MCSP's inmate appeals record keeping system that plaintiff submitted an inmate appeal on or before May 4, 2004, alleging that any correctional officer confiscated and destroyed his law books and other personal property.  <u>Id.</u>, P 6.

In his October 26, 2006, statement of facts, plaintiff states that appeal no. 02-724 exhausted his claims against defendants Burton and Allen.  Appeal no. 02-724 concerned plaintiff's transfer to SATF.  Plaintiff's Exhibit D.  In his declaration filed in support of his opposition, plaintiff states that "[d]efendants' claims that plaintiff did not file administrative appeals on retaliation is refuted by the numerous appeals stating retaliation time and again in many areas of plaintiff's incarceration."  Plaintiff's declaration, p. 17.  Plaintiff offers no evidence that he filed an appeal against defendants Burton and Allen regarding the claims raised against them in the instant action.  Accordingly, the court finds that plaintiff failed to exhaust administrative remedies against these defendants.

Accordingly, IT IS HEREBY RECOMMENDED that:

1.  Defendants' July 12, 2006, motion to dismiss the claims against defendants Todd, Burton and Allen based on plaintiff's failure to exhaust administrative remedies be granted;

2.  Defendants' July12, 2006, motion for summary judgment as to defendants Sainz, Smith, Douglas, Nelson, Williams and Bulanon be granted.

1    These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

3   days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6   shall be served and filed within ten days after service of the objections.  The parties are advised

7   that failure to file objections within the specified time may waive the right to appeal the District

8   Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

9   DATED:   2/20/07

                                          /s/ Gregory G. Hollows

10                                        _____

11                                        GREGORY G. HOLLOWS
                                          UNITED STATES MAGISTRATE JUDGE

12

13   high887.sj